UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE GUADALUPE,

                Plaintiff,

      -against-

THE CITY OF NEW YORK, New York City Department
of Correction ("DOC") Commissioner JOSEPH PONTE,
DOC Chief of Department WILLIAM P. CLEMONS,
DOC Deputy Commissioner of Investigations Division
JAMES BLAKE, Warden YOLANDA CANTY, Captain
DEVON MITCHELL Shield #1641, Captain
JONATHAN CHARLES Shield #1349, Captain
MOTASIR MIAH Shield #290, Correction Officer
JEFFREY McDUFFIE Shield #7246, Correction Officer
JOSEPH DELEON Shield #14993, Correction Officer
DURRELL SMALLS Shield #12052, and Correction
Officer DELRON DAWKINS Shield #7198,

                Defendants.

**FIRST AMENDED
COMPLAINT AND JURY
TRIAL DEMAND**

No. 15 Civ. 220

Plaintiff Jose Guadalupe, by and through his attorneys Emery Celli Brinckerhoff
& Abady LLP and The Legal Aid Society, for his First Amended Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought by plaintiff Jose Guadalupe for
damages pursuant to 42 U.S.C. § 1983.  On September 2, 2014, while in the custody of the New
York City Department of Correction ("DOC" or the "Department"), Mr. Guadalupe was
viciously beaten by DOC staff members.

2.      At the time of the assault, Mr. Guadalupe, who has a mental retardation
diagnosis, was detained in solitary confinement in the George R. Vierno Center ("GRVC") jail at

Rikers Island.  On September 2, 2014, there was an institutional search of Mr. Guadalupe's cell.

In accordance with standard procedures, Mr. Guadalupe was strip-searched and handcuffed

before the search began.  As the search was ongoing, and while Mr. Guadalupe was handcuffed,

correction officers tore down and crumpled the pictures he had on the wall of his cell.  Mr.

Guadalupe asked to speak with a captain about this.  In response to this request, four DOC

correction officers dragged Mr. Guadalupe into his cell, threw him onto the floor, and savagely

punched him multiple times in the head and kicked him multiple times in the back, legs, and ribs.

During this entire assault, Mr. Guadalupe was handcuffed, lying face down on the floor.  For six

hours after the assault, Mr. Guadalupe was left in a hot intake cell without medical attention, as

he went in and out of consciousness.  As a result of this brutal beating, Mr. Guadalupe lost

consciousness and sustained a concussion; a laceration to his face that required stitches; swelling

to his jaw, temple, and ear; bruised ribs; and severe lower back pain.  He was also diagnosed

with post-concussion syndrome, which left him so dizzy that he spent approximately three weeks

after the assault confined to a wheelchair.  To this day, he continues to experience painful

headaches that he did not have before the assault.  This assault is part of a pattern and practice of

unchecked guard-on-inmate brutality at Rikers Island.

    3.  The Department and its supervisors are, and have been, aware that DOC

staff members persistently use brutal force and cause prisoners serious injuries, and they have

consistently, for years, failed to take meaningful and effective steps to curb staff brutality in the

New York City jails.  The incident involving Mr. Guadalupe is part of a pattern of incidents

where DOC officers use excessive and injurious force to command, control, or discipline

inmates.  As a result of these attacks, Mr. Guadalupe suffered significant injuries, including

injuries to his face, ribs, and back; a concussion and post-concussion syndrome; and neurological damage.

## JURISDICTION AND VENUE

4.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

5.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a).  This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

6.      The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

7.      Plaintiff demands trial by jury in this action.

## PARTIES

8.      Jose Guadalupe is a citizen of the United States and resided at Rikers Island in Bronx County at the time these events occurred.  At the time of the September 2, 2014 assault, Mr. Guadalupe was detained at the George R. Vierno Center ("GRVC") at Rikers Island.

9.      Defendant City of New York ("City") is a municipal corporation that, through the DOC, operates a number of detention jails.  The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders.  In addition, senior officials in the Department are aware of, and tolerate, certain practices by subordinate employees in the jails, including those that are inconsistent with formal

policy.  These practices, because they are widespread, long-standing, and deeply embedded in the culture of the Department, constitute unwritten Department policies or customs.  The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

10.     At all times relevant hereto, Joseph Ponte was and is the Commissioner of the DOC, acting in the capacity of agent, servant and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Upon information and belief, Defendant Ponte, as Commissioner of the DOC, is responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.  As Commissioner, Defendant Ponte is also responsible for the care, custody, and control of all inmates housed in the Department's jails.  As Commissioner, Defendant Ponte is provided, on a daily basis, with reports of applications of force, allegations of unreported uses of force, and other breaches of security in the Department jails.  In addition, at all relevant times, Defendant Ponte was and is responsible for enforcing the rules of the DOC and for ensuring that DOC personnel obey the laws of the United States and of the State of New York.  Defendant Ponte is sued in his individual capacity.

11.     At all times relevant hereto defendant William P. Clemons was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  As Chief of Department, he was the highest-ranking uniformed member of the Department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the

DOC jails.  He was also responsible for the care, custody, and control of all inmates in the DOC

jails.  Defendant Clemons is sued in his individual capacity.

12.     At all times relevant hereto, Defendant James Blake was the Deputy

Commissioner of the Department's Investigation Division.  As Deputy Commissioner, his

responsibilities included supervising the investigation of any and all incidents in which any

employee of the Department used force against any inmate, or was alleged to have used force,

and recommending Department discipline against staff believed to have violated Department

policies and rules, including those concerning use of force.  Defendant Blake was provided on a

daily basis with reports of applications of force, allegations of unreported use of force, and other

breaches of security in Department jails.  Defendant Blake is sued in his individual capacity.

13.     At all times relevant hereto, Defendant Yolanda Canty was the Warden of

GRVC within DOC, acting in the capacity of agent, servant, and employee of Defendant City,

within the scope of her employment as such, and acting under color of state law.  As Warden, her

responsibilities included the care, custody, and control of all inmates, as well as the supervision

of all staff, in the GRVC.  On information and belief, Defendant Canty was promoted by DOC

after the beating of Mr. Guadalupe.  Defendant Canty is sued in her individual capacity.

14.     At all times relevant hereto, Defendant Captain Devon Mitchell, Shield

#1641, was a supervising officer within the DOC, acting in the capacity of agent, servant, and

employee of Defendant City, within the scope of his employment as such, and acting under color

of state law.  Upon information and belief, Defendant Mitchell worked at GRVC on Rikers

Island on September 2, 2014.  Defendant Mitchell is sued in his individual capacity.

15.     At all times relevant hereto, Defendant Captain Jonathan Charles, Shield

#1349, was a supervising officer within the DOC, acting in the capacity of agent, servant, and

employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Upon information and belief, Defendant Charles worked at GRVC on Rikers Island on September 2, 2014.  Defendant Charles is sued in his individual capacity.

16.     At all times relevant hereto, Defendant Captain Motasir Miah, Shield #290, was a supervising officer within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Upon information and belief, Defendant Miah worked at GRVC on Rikers Island on September 2, 2014.  Defendant Miah is sued in his individual capacity.

17.     At all times relevant hereto, Defendant DOC Officer Jeffrey McDuffie, Shield #7246, was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Upon information and belief, Defendant McDuffie worked at GRVC on Rikers Island on September 2, 2014.  Defendant McDuffie is sued in his individual capacity.

18.     At all times relevant hereto, Defendant DOC Officer Joseph Deleon, Shield #14993, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Upon information and belief, Defendant Deleon worked at GRVC on Rikers Island on September 2, 2014.  Defendant Deleon is sued in his individual capacity.

19.     At all times relevant hereto, Defendant DOC Officer Durrell Smalls, Shield #12052, was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Upon information and belief, Defendant Smalls worked at GRVC on Rikers Island on September 2, 2014.  Defendant Smalls is sued in his individual capacity.

20.     At all times relevant hereto, Defendant DOC Officer Delron Dawkins, Shield #7198, was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Dawkins worked at GRVC on Rikers Island on September 2, 2014.  Defendant Dawkins is sued in his individual capacity.

21.     Defendants Mitchell, Charles, Miah, McDuffie, Deleon, Smalls, and Dawkins are collectively referred to as the "Individual Defendants."

22.     Defendants Ponte, Clemons, Blake, and Canty are collectively referred to as the "Supervisory Defendants."

## STATEMENT OF FACTS

**New York City's Jails: A History of Abuse**

23.     As of the time Mr. Guadalupe was beaten, the Supervisory Defendants were aware of the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it.

24.     For decades, through Department reports and civil litigation, the DOC has been aware of the routine, dangerous and unconstitutional use of excessive force by staff at individual facilities under the control of the DOC.

25.     For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit ("CPSU").  That litigation unearthed evidence of abuse of prisoners and cover-ups that were sufficiently serious to merit criminal prosecution.

26.     *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the pervasive practice of using excessive force against inmates incarcerated in New York City's jails.  That litigation revealed significant numbers of credible excessive force complaints by prisoners who had been seriously injured by staff in the City jails.  The settlement of that class action was intended to provide meaningful improvements in the training, practice, and supervision of DOC staff and investigators, and changes in the Department's use of force policy.

27.     In 2011, the City was named as a defendant in *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), a class action lawsuit that alleges widespread use of excessive force by correction officers at Rikers island.  The operative complaint in that suit once again placed the City on notice that "officers and captains" at Rikers "have inflicted brutal beatings on . . . inmates" and "have lied and coerced false statements to prevent the beatings from coming to light," while supervisors have created and perpetuated "a policy of permitting uniformed staff to use unlawful, excessive force with impunity."  Second Am. Compl., *Nunez v. City of N.Y.*, No. 11 Civ. 5845 (S.D.N.Y. Sept. 4, 2012), ECF No. 34 ¶ 1.

28.     The United States Attorney's Office for the Southern District of New York has investigated the problem of excessive force by Department staff on Rikers Island, as have the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the Bronx District Attorney's Office, and the *New York Times*. Mark G. Peters, Commissioner of the Department of Investigation, condemned the " pattern of lawless conduct at Rikers that must be brought under control."  The *New York Times* reported recently, after a months-long investigation of Rikers, that "brutal attacks by correction officers on inmates" are "common occurrences" at Rikers and observed that "a dearth of whistle-

8

blowers" as well as "reluctance of the city's Department of Correction to acknowledge the

problem and the fact that guards are rarely punished" contribute to what the *Times* called a

"culture of brutality on the island."

29.     On August 4, 2014, the United States Attorney for the Southern District of

New York released a report that documented conclusions reached after a two-year investigation

of conditions at Rikers Island pursuant to the federal Civil Rights of Institutionalized Persons

Act.  The U.S. Attorney concluded that a "culture of violence" pervades the jail, and that officers

use excessive force and injure prisoners at a staggering rate, all within a system that fosters and

guarantees impunity.  While the report focused on the adolescent population at Rikers, the

federal authorities noted: "our investigation suggests that the systemic deficiencies identified in

this report may exist in equal measure at the other jails on Rikers."

30.     Also in August 2014, the Office of the New York City Comptroller issued

a report concerning injury claims filed against DOC and settlement and judgments issued against

DOC in fiscal year 2014.  The report demonstrated the City's awareness of the widespread use of

injurious force in City jails.  For example, the report showed that personal injury claims against

the City for injuries occurred at correction facilities have climbed steadily in recent years.

According to the Comptroller's office, 2,245 such claims were filed against DOC in fiscal year

2014, an increase of 37% over fiscal year 2013 and a 114% increase since fiscal year 2009, when

just over 1,000 such claims were filed.  The report also showed that personal injury claims

involving incidents at GRVC have risen steadily in recent years, from just over 100 in fiscal year

2009 to nearly 250 in fiscal year 2014.

31.     DOC's own Commissioner, Joseph Ponte, testified before the New York

City Council on June 2, 2014.  He admitted that the Department "is in deep trouble" and stated

that DOC's "past performance has been unacceptable."  As support for this conclusion, Mr.

Ponte cited statistics on increasing violence in the City's jails dating back to 2010—well before

the beating of Mr. Guadalupe.

32.     On information and belief, the number of incidents in which use of force

has resulted in class A injury (an injury requiring medical treatment beyond prescribing over-the-

counter analgesics or administering minor first aid) to staff and/or inmates has steadily increased

over the last several years.  In 2008, there were 88 such incidents reported, followed by 109

incidents in 2009, 128 incidents in 2010, 142 incidents in 2011, and 147 incidents in 2012.

33.     At a news conference on November 20, 2014, Mayor Bill de Blasio

condemned the brutality at Rikers Island, described the DOC as the City's most troubled agency,

and declared that Rikers Island "deeply needs a culture change."

34.     Cover-ups are also a part of DOC culture.  For example, according to the

*New York Times*, DOC's own investigators produced a report in 2012, which concluded that

Department staff, including the warden and deputy warden of the Robert N. Davoren Complex at

Rikers Island ("RNDC"), had participated or been complicit in the intentional falsification of

statistics in order to create the false appearance that violence in the jail was declining.  The report

originally stated that "no legitimate explanation exists for the dramatic and inaccurate decreases

in the number of inmate fights," and recommended that RNDC's warden and deputy warden be

demoted because they "abdicated responsibility" and "failed to supervise, manage, or oversee the

facility's reporting of violence statistics."  Instead of demoting them, however, then-DOC

Commissioner Dora Schriro ordered that the report be sanitized of any mention of their

wrongdoing.  The United States Attorney's Office, which was in the midst of investigating

violence at the jail, received only the doctored report.  When the cover-up was unearthed, the

10

United States Attorney stated that such a cavalier attitude toward the truth "does not instill confidence in us that the City will quickly meet its constitutional obligations."

35.     On December 18, 2014, the Department of Justice filed a motion to intervene in the *Nunez* case against the City.  The Court granted that motion.

36.     On October 21, 2015, the Court entered a consent judgment in the *Nunez* case requiring the City to reform its policies, practices, and procedures to reduce violence at Rikers Island and create safer conditions for inmates.

37.     GRVC in particular is a site of intense and unchecked staff-on-inmate violence.  The City has been on notice of this fact for years and has failed to take adequate or appropriate steps to remedy the situation.  For instance, the City has been sued repeatedly for violating GRVC inmates' constitutional right to be free from the use of excessive force.  *See, e.g.*, *Joseph v. N.Y.C.D.O.C.*, No. 02 Civ. 9219 (S.D.N.Y.) (plaintiff beaten at GRVC, resulting in an orbital fracture; case settled for $375,000); *Rice v. N.Y.C.D.O.C.*, No. 03 582 (S.D.N.Y.) (two plaintiffs beaten at GRVC suffered a collapsed lung and spinal injuries, respectively; cases settled for $255,000 and $590,000 respectively); *Youngblood v. City of N.Y.*, No. 08 Civ. 5982 (S.D.N.Y.) (GRVC officers brutally beat plaintiff in the head and body with fists and blunt objects, causing a broken nose, head trauma, and other injuries; case settled for $240,000); *Pauling v. City of N.Y.*, No. 09 Civ. 2617 (S.D.N.Y.) (GRVC officers stomped on plaintiff's head after positioning his head directly over a solid metal bedframe; plaintiff accepted City's offer of judgment in the amount of $75,001 plus attorneys' fees).

38.     The City and the Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in the City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

39.     Through all these cases and Department reports, the DOC and the Supervisory Defendants have been made aware of the widespread practice by DOC staff members of using excessive and/or unnecessary force to injure, and not restrain, inmates.  They have also been made aware of the failure of DOC's Investigation Division to adequately investigate allegations of misconduct and of the *de facto* refusal of the Department to bring effective disciplinary charges against its officers, to promote institutional reform, and to protect the safety of prisoners confined in DOC custody.

40.     The Department has not taken sufficient steps to curb the abuse that occurs on a daily basis in New York City jails.  Indeed, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

**The September 2, 2014 Assault on Jose Guadalupe**

41.     On September 2, 2014, Mr. Guadalupe was detained in the 11B housing area at GRVC.

42.     Mr. Guadalupe has been diagnosed with mild mental retardation.

43.     Mr. Guadalupe was detained in solitary confinement.

44.     Around 12:00 p.m. (noon) that day, Mr. Guadalupe was in his cell when a team of DOC officers arrived to conduct a search.

45.     The officers strip-searched Mr. Guadalupe, handcuffed him behind his back, and took him out of his cell.

46.     Defendant Officer McDuffie was the officer who applied the handcuffs to Mr. Guadalupe.

47.     Officer McDuffie applied the handcuffs very tightly, causing bruises to Mr. Guadalupe's wrists that were still visible more than two weeks later.

48.     The officers then proceeded to search his cell.

49.     Mr. Guadalupe followed all of the officers' orders and was cooperative during this procedure.

50.     Captain Mitchell was present during the search and ordered the DOC officers to remove Mr. Guadalupe's pictures from the back wall of the cell.

51.     The officers tore down all the pictures in the cell (not just those on the back wall) and crumpled them up.

52.     Mr. Guadalupe protested that the captain had ordered the removal of only those pictures on the back wall.

53.     During this entire time, Mr. Guadalupe remained in handcuffs.

54.     Officer McDuffie told Mr. Guadalupe "Shut the fuck up!"

55.     Mr. Guadalupe called out for the captain.

56.     Captain Mitchell appeared and told Mr. Guadalupe: "Don't violate my tour!"

57.     Officer McDuffie ordered Mr. Guadalupe to face the wall.  When Mr. Guadalupe complied, Officer McDuffie smashed his face into the wall.

58.     Captain Mitchell then told Mr. Guadalupe to get back into his cell.

59.     Officer McDuffie then dragged Mr. Guadalupe, who was still in handcuffs, into his cell and threw him to the floor, facedown.

60.     Officers Deleon, Smalls, and Dawkins then came into Mr. Guadalupe's cell.

61.     While Mr. Guadalupe was lying on the floor of his cell, handcuffed, the Individual Defendants proceeded to viciously assault and beat Mr. Guadalupe.

62.     Officer McDuffie struck Mr. Guadalupe in the face multiple times, on both sides of the face.

63.     At the same time, other officers punched and kicked Mr. Guadalupe in the back, the legs, and the ribs.

64.     Officer McDuffie shouted: "This is for disrespecting my search!" and "Get him, hit him!"

65.     When the assault began, Captain Charles and Captain Mitchell stood just outside Mr. Guadalupe's cell, only one or two feet from the open cell door.  Captain Miah stood approximately five feet from the cell, directly facing the open cell door.

66.     Mr. Guadalupe repeatedly cried out in pain during the assault.

67.     Other inmates who could see and hear the assault loudly protested that Mr. Guadalupe was being punched and beaten.

68.     During the assault, Captain Miah walked toward the open cell door with an outstretched hand.  Captain Miah either passed something to or received something from one of the correction officers inside the cell.

69.     During the assault, Captain Charles told another correction officer to get a stretcher for Mr. Guadalupe.

70.     Captain Charles then moved into the doorway of Mr. Guadalupe's cell.

71.     Captain Charles watched the beating continue for another full minute while standing in the doorframe of the cell.

72.     Captain Mitchell and Captain Miah stood approximately one to two feet behind Captain Charles, just outside the open cell door.

73.     The assault inside Mr. Guadalupe's cell was readily visible and audible to Captain Mitchell, Captain Charles, and Captain Miah.

74.     Captain Mitchell, Captain Charles, and Captain Miah took no action to stop the assault.

75.     Only when the stretcher arrived did Captain Charles tell the officers, "Alright, that's enough."

76.     In total, the assault lasted for several minutes.

77.     When it was finished, Mr. Guadalupe was bleeding from cuts above his right eyebrow and to his lip, was bruised all over his body, and was dizzy and dazed.

78.     Officers threw Mr. Guadalupe down on the stretcher.

79.     DOC staff cleaned up the blood on Mr. Guadalupe's face.

80.     After Mr. Guadalupe was cleaned up, Captain Mitchell took photos of him.

81.     Mr. Guadalupe was experiencing extreme pain in his ribs and lower back and was very dizzy.

82.     Mr. Guadalupe's urine was dark orange (a color which persisted over the next day and a half).

83.     DOC staff threw Mr. Guadalupe into a very hot intake cell.

84.     Mr. Guadalupe lost consciousness.

85.     He regained consciousness when Officer Dixon, an officer assigned to the intake area, threw cold water on him.

86. Mr. Guadalupe overheard Officer Dixon saying to other correction officers, in sum and substance, "I can't have him here. He could die."

87. Medical staff in the GRVC clinic first documented contact with Mr. Guadalupe at 6:13 p.m. on September 2, 2014—approximately six hours after the assault.

88. Medical staff at the GRVC clinic noted that they found Mr. Guadalupe "soak [sic] and wet" when they first saw him, that he appeared "dazed" and was "not able to verbalize," and that a DOC officer informed them that Mr. Guadalupe had "been in and out of consciousness."

89. Staff in the GRVC clinic noted that Mr. Guadalupe had a head injury, left temporal swelling with tenderness, right periorbital swelling, a laceration to the his right eyebrow, left ear swelling, tenderness in the preauricular area, and swelling to his left jaw.

90. Clinic staff gave Mr. Guadalupe Tylenol, put peroxide on his wounds, and cleaned up the blood.

91. At 6:17 p.m., according to the medical records, DOC staff finally called for an ambulance for Mr. Guadalupe.

92. Mr. Guadalupe was then taken to Elmhurst Hospital. Elmhurst staff documented a bleeding laceration to Mr. Guadalupe's right eyebrow and bruising to his right eyelid. Mr. Guadalupe was sent for a CT scan, which revealed soft tissue injuries to multiple parts of the head, including in the following areas: right periorbital (eye), left temporal (side of the skull), left preauricular (ear), and lower occipital (back and lower part of the skull), which Elmhurst staff described as "multiple soft tissue contusions." Elmhurst staff closed the laceration to Mr. Guadalupe's right eyebrow with sutures and gave him Percocet to reduce the pain he was experiencing. Mr. Guadalupe was kept in the hospital overnight.

16

93.     When Mr. Guadalupe was returned to Rikers the next day, he was placed back in the very same cell at GRVC.

94.     Mr. Guadalupe was still extremely dizzy.

95.     Mr. Guadalupe told Officer Reid that he was dizzy and very hot.  She brought him some cold water.

96.     Mr. Guadalupe then lost consciousness again.

97.     When he regained consciousness, he was placed on a stretcher and brought to the GRVC clinic.  His head was pounding and he was extremely dizzy.

98.     Mr. Guadalupe was then taken to Bellevue Hospital, where medical staff documented his complaints of headache, nausea, dizziness, and vertigo.  Bellevue staff diagnosed Mr. Guadalupe with a concussion and with post-concussive syndrome.

99.     When Mr. Guadalupe was returned to Rikers, he was again placed in the same cell in GRVC.

100.    Mr. Guadalupe continued to complain of extreme dizziness.

101.    Mr. Guadalupe then lost consciousness for a third time.

102.    Only after that was Mr. Guadalupe moved to the North Infirmary Command ("NIC"), the jail for housing sick and injured inmates on Rikers Island.

103.    Upon Mr. Guadalupe's arrival at NIC, he was placed in a wheelchair due to his continued dizziness and extreme pain to his ribs and lower back

104.    He remained confined to a wheelchair for approximately three weeks.

105.    During that time, he continued to experience severe pain to his lower back and ribs, had a large blood clot in his right eye, and had visible bruising on his wrists and scarring to his right eyebrow area.

106.     But worst of all was the extreme dizziness Mr. Guadalupe continued to experience.  He was so dizzy that he would fall down when he tried to stand up.

107.      Since the assault, Mr. Guadalupe has continued to experience very painful headaches that he never had before the assault.  These headaches leave him breathless and require him to lie down.  He gets these headaches approximately three times per week.

108.     Mr. Guadalupe's right eye is still very tender, extremely itchy, and watery. Mr. Guadalupe also continues to experience periodic blurry vision in both eyes.

109.     Mr. Guadalupe received an infraction ticket for the incident on September 2, 2014, which falsely accused him of disobeying a correction officer's orders and of spitting on a correction officer.

110.     But, when Mr. Guadalupe appeared at the hearing on the infraction, the charges were dismissed without explanation.

111.     Within ninety days after the September 2, 2014 assault, a written Notice of Claim, sworn by Plaintiff, was served upon Defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

112.     At least thirty days have elapsed since the service of the Notice of Claim and adjustment or payment of the claim has been neglected or refused.

113.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourth and Fourteenth Amendments Excessive Force**
**(Against All Individual Defendants and Supervisory Defendants)**

114.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

115.    By reason of the foregoing, by assaulting, battering and using gratuitous, excessive, brutal, sadistic, and unconscionable force on Mr. Guadalupe, and by failing to prevent other defendants from doing so, the Individual Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution to be free from gratuitous and excessive force.

116.    The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment as DOC officers and employees.  Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

117.    The Supervisory Defendants knew that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assaults on Plaintiff.  Their failure to take measures to curb this pattern of brutality constitutes acquiescence in the known unlawful behavior of their subordinates.  The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's beatings, and the failure of the Supervisory Defendants to take remedial action despite the fact that the misuse of force in City jails had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Plaintiff.  The Supervisory Defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

118.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourteenth Amendment Excessive Force**
**(Against Defendant City)**

119.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

120.    Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff brutality by DOC staff at the time of Plaintiff's beating.  This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice, or custom and led to Plaintiff's assault.

121.    By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to a brutal beating, Defendant City has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the right to be free from gratuitous and excessive force guaranteed by the Fourteenth Amendment to the United States Constitution.

122.    As a direct and proximate result of the policy, practice, and custom detailed above, Plaintiff sustained the damages hereinbefore alleged.

**THIRD CLAIM FOR RELIEF**
**Assault**
**(Against Defendant City and the Individual Defendants)**

123.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

124.     By reason of the foregoing, and by threateningly approaching Plaintiff and aiming to strike and kick him, the Individual Defendants, acting in their capacities as DOC officers and employees, and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of imminent offensive contact, and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

125.     The assault committed by the Individual Defendants was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

126.     Defendant City, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

127.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CLAIM FOR RELIEF
**Battery**
**(Against Defendant City and the Individual Defendants)**

128.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

129.     By reason of the foregoing, and by intentionally punching and kicking Plaintiff, the Individual Defendants, acting in their capacities as DOC officers and employees, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

130.     The battery committed by the Individual Defendants was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

21

131.    Defendant City, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

132.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FIFTH CLAIM FOR RELIEF
**Negligent Hiring/Training/Discipline/Retention of Employment Services**
**(Against Defendant City)**

133.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

134.    Defendant City, through the DOC, owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

135.    Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

136.    Upon information and belief, Defendant City knew or should have known through the exercise of reasonable diligence that the Individual Defendants were potentially dangerous.

137.    Upon information and belief, Defendant City's negligence in screening, hiring, training, disciplining, and retaining the Individual Defendants proximately caused each of Plaintiff's injuries.

138.    As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.     Compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Guadalupe as a result of the events alleged herein.

2.     Punitive damages against the Individual Defendants and Supervisory Defendants in an amount to be determined at trial.

3.     An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action.

4.     Such other and further relief as the Court may deem appropriate.

Dated: February 9, 2016
       New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

Jonathan S. Abady
Debra L. Greenberger
Zoe Salzman
Douglas E. Lieb*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

THE LEGAL AID SOCIETY
Jonathan S. Chasan
Mary Lynne Werlwas
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

*Attorneys for Plaintiff*

---

* Admitted to practice in California and *pro hac vice* in this action.

23